Your Honors, may it please the Court, my name is Robert Finkel. I'm here today for the Plaintiff Appellant Northstar. The action arises out of a 1997 proxy statement which Schwab, for purposes of creating an index fund for its clients, issued a very specific proxy statement that was subject to a shareholder vote. At the time it was a government bond fund. Schwab described in great detail what an index fund was. The market for the index fund was 9,000 different securities. Schwab would choose which one of those securities would fall within the index fund so that the fund itself would mirror the performance of the index. In 1997, the shareholders, thinking it was a good idea, and at the time it was a very small fund, $24 million, voted in favor of this. As a result of that, Schwab issued a statement saying it's now going to be an index fund. And for all the world, it was an index fund from 1997 to about 2007. It operated as an index fund pursuant to this very specific policy that was stated in Proposal No. 2 of the 1997 proxy statement, which is available on the SEC website and would be referenced from time to time in the prospectus and the registration statements and the annual and semiannual shareholders to letters, saying it's an index fund. It was not only an index fund, but it had to be an index fund because it was stated as a fundamental investment policy that was only changeable by shareholder vote. Now, Schwab at any time could have issued another proxy statement to its shareholders, and, of course, this was very successful because bond indexes are very secure investments. They're a mom-and-pop type of an investment that people who want to build equity will put $100 or so on a monthly, weekly, semiannual basis, and they'll build up their equity in this index fund, knowing that Lehman Brothers comprises the index out of conservative either government investments, agency investments, or high-quality corporate investments. Now, about 1 or 2 percent of the Lehman Index comprised what one would call a more aggressive type of an investment, like automobile loans or things like that. But it was only 1 percent. Schwab, for whatever reason, which we'll find out hopefully in discovery, decided in 2007 that they weren't happy with this index fund. And they had this guy, his name was Damon DeFotis, who was running the fund, and he decided that he was going to go whole hog on collateralized mortgage obligations. So he was going to take this fund of $1.5 billion in which Schwab was committed by the 1997 proxy statement to operate as an index fund, and he turned it into a high-yield CMO fund. Now, we know what happened in 2007. The market went down. And as a result, I was going to bring the chart, but I believe it's paragraph 117 in our third amended complaint, the fund, after performing with the index until 2007, plummeted for a period of about a year until it could right itself. From that period, from 2007 to 2008, the fund underperformed the index by about 12 percent. Now, on $1.5 billion, 12 percent is damages of $180 million that's taken away from my class, which is the investors in the fund. Now, an index fund is not a complex thing. My clients could have bought something from Vanguard or any other fund company that was doing essentially the same thing, all of which were able to perform with the index from 2007 to 2008. Judge Coe, below, found that the specific policy stated in Proposal No. 2 of 1997 did not form a contract that Schwab had to comply with. Judge Coe primarily relied on this Court's decision in McKesson, saying that an SEC document is a disclosure document rather than forming a binding contract. McKesson is a totally different case, because McKesson was, in fact, just a shareholder vote to ratify a different contract, the contract between McKesson and HBOC in a merger agreement. The shareholders in McKesson and HBOC were not parties to that agreement, and therefore, the shareholder vote ratifying the separate agreement didn't purport to create a contract, and that's what this Ninth Circuit determined in McKesson. But our case is entirely different, because there, Schwab was stating in Proposal No. 2, if you ratify this, we will form a contract with you to operate that as an index fund only changeable by subsequent shareholder vote. Now, we have a lot of cases with regard to the sale or holding of securities in our brief that say that statements like this, in connection with the sale of securities, are specific representations with respect to performance that are required to be adhered to by the seller of the securities, and if they violate that representation as to how they will operate the fund, that's a breach of contract. I know we have the Bergeron case. We have a number of cases that are cited that support the breach of contract. Now, if I may just go on to the breach of fiduciary duty case claim. The contract claim is against the trust. Kennedy, Mr. Finkel, at the time of the 1997 proxy statement which you have been talking about, did Northstar own any shares? No, Your Honor. At the time of the 2007 drop in the market when you claim, when you asserted a matter of complaint, that Northstar did not follow its representations and the proposal 2 in 1997, did Northstar own any shares? Well, when you say own shares, it didn't actually own shares. It was the investment advisor for investors who owned shares, and Northstar ultimately took an assignment to those investors and amended the complaint to assert the claim. Its clients owned shares in 2007. And you – but not in 1997. Not in 1997. Not until August 31st, 2007, right? Northstar's clients owned shares in 2007, yes. So why do you have standing to make – to bring this case? Because by investing in the security, we, pursuant to the agreement that – But Northstar didn't invest. No, no. Northstar – you're talking about the standing issue specifically? Yes. We have standing because under the Huff decision in the Second Circuit that both Judge Koh and both Northstar followed, we have standing if we take an assignment from one of our Northstar's clients. We're not in the Second Circuit. Do you have any Ninth Circuit cases that say that? The Ninth Circuit has not – has not specifically said whether or not you can take an assignment. But actually, the Ninth Circuit has said in the employer's Teamsters case that – and that was decided in 2007 – that an investment advisor did have standing to bring – to bring an action. That's the employer's Teamsters case? Correct. In fact, when we brought – and when we brought the action, I can quote the language to, when we brought the action in 2009, we did the research, and we saw that in 2007, this Court said that an investment advisor does have standing to bring a lawsuit with respect to the sale of securities. Now, that was under the Private Securities Litigation Reform Act, but our understanding of the law at the time, in 2007, or 2009 when we brought the action, is that an investment advisor who's sophisticated and can adequately represent people who purchase pursuant to his advice and who relied on the statement of the contract by Schwab did have standing. And the citation – And in your complaint, can you refresh my recollection? Who did you say you were suing on behalf of? In the initial complaint?  You said the plaintiff – I'm suing on behalf of investors in the fund. And that's exactly the wording of the complaint? I have the complaint, if you want me to get it. But that's in essence either to shareholders or investors in the fund as of the approximate date that we filed the complaint. Why doesn't that constitute associational standing? Well, I believe it should, but I do know that Judge Ilston, in the initial decision in this case in early 2009, decided to apply Huff. And as a result of that, she said – she asked us to amend the complaint. We had put into the record on the motion to dismiss the initial complaint. We filed the complaint in 2008. The decision by Judge Ilston was in February of 2009. We put into the record on the motion to dismiss the assignment from the client that we received after we filed the initial complaint. And we said we're willing to amend the complaint to allege the assignment. Judge Ilston did adopt the Second Circuit decision in Huff and did say – which may not have been necessary because the Ninth Circuit may have been more liberal in that regard – and she did say you could cure what she perceived as a defect in standing by amending the complaint, which is what we did. And then subsequently, Schwab said that the standing had to exist at the time of the initial complaint, and Judge Koh rejected that argument. So you have two district court judges in this case, both of whom have said that you could amend a complaint that may have been – it wasn't clear that the Teamsters case is bad law in this court, but may have been insufficient on standing. Two courts, two district courts in this case, have said that what we did by amending the complaint is – Well, it's the same district court you say got everything else wrong. So that may not be – Well, I understand that. But you can't fool us by – you can't fool Northstar by following the direction of the court to amend the complaint. They didn't stop you from filing an amended complaint. They didn't stop you from filing another complaint and another complaint. They didn't stop you from filing another action. So – One thing I do want to cite, too, is there's a case that the defendants cited to Newman Green, which they say supports their argument that standing has to exist at the time of filing the initial complaint. Now, Newman Green is a Supreme Court decision. The citation is 490 U.S.A. 26. What happened there is that the plaintiff joined a nondiverse party, and therefore the – I believe it was the Seventh Circuit said that we don't have complete diversity among the parties, but said after the complaint had been filed, we'll dismiss the – one of the defendants, the nondiverse defendant, to create diversity. So diversity didn't exist when the complaint was filed. But when it got to the Seventh Circuit, the Seventh Circuit said we'll create diversity after the fact, non-pro-tunk, by dismissing a nondiverse defendant. And this is what the Supreme Court said, first citing Judge Posner. And it's exactly on point with regard to the technicality of whether it was appropriate to file an amended complaint or to dismiss the complaint and file a new complaint in this action. Citing Judge Posner, law is an instrument of governance rather than a hymn to intellectual beauty. Some consideration must be given to practicalities. And then the Supreme Court, in its own language, said Newman Green, referring to the party, should not be compelled to jump through these judicial hoops merely for the sake of hyper-technical jurisdictional purity. Now, I can say as an aside that when we filed the second complaint with the assignment, named for the first time the trustees. So we had standing when we did name the trustees. But to require us either now or at an earlier time to go through the technicality of dismissing the initial complaint when Judge Ilston found that we had standing by virtue of the assignment and could file an amended complaint would be, with all due respect, as stated by the Supreme Court in Newman Green, hyper-technical jurisdictional purity and this. So if I understand you, you could file a new complaint as opposed to a supplemental or amended complaint alleging exactly what you've alleged, and that would be sufficient? Well, we certainly could have done it in 2009. Are you barred by the statute of limitations? You know, I would say it's non-protungent and would relate that, but I can't speak for Schwab. Suppose we were back then. I mean, so the difference would be the difference between taking timeliness, you know, a statute of limitations out of the equation. So the difference is whether you file an amended or supplemental complaint or you simply start a new action with the same complaint that would give you standing. That's what we're talking about. No difference. No difference in 2009. I don't think it's any difference now. No, no. I just want to understand what the alternatives are, because it does personally strike me as absurd to have you go through that exercise. I just want to put into the record a decision that we didn't have in the brief. It's the Fifth Circuit on the standing session, 648 F. 2nd, 1066. The applicable language is on page 1070. I have a lot to say on a couple of things, but I only have 20 seconds left. So I think that's it. That's F. 2nd or F. 3rd? I'm sorry. I believe it's F. 2nd. Let me just check. Yes, it's F. 2nd. It's the Fifth Circuit. It's a very good decision. And also we cite a very good decision from the Second Circuit in Advanced Magnetics in our brief. The law, with the exception of bad cases where somebody clearly doesn't have standing and a judge says as an aside that standing has to exist at the time of the filing of the complaint, the law is very allowing in amending complaints to allege standing. They recognize what the Supreme Court said in the case I cited, and as Judge Corman suggested, that it's silly to dismiss the complaint and refile the complaint when you could just file an amended complaint to have standing. Anyway, thank you for your time, and hopefully you'll give me another two minutes at the end. We'll hear from defendants. Good morning, Your Honors. Richard Scherzer on behalf of the appellees. May it please the Court. The overwhelming weight of both Supreme Court authority where it exists and Circuit Court authority goes against North Star on every issue that is germane to this appeal. On the standing issue, the Supreme Court has held repeatedly that the jurisdiction of Article III courts depends on the state of things at the time the action was brought. That is the holding of Lujan. That is the holding of the Supreme Court. Yeah, but it seems to me the state of things was that they had standing. It was only a question of something that wasn't alleged in the complaint. It wasn't as if two years later a new event occurred. They had standing. It was only simply a question of what was alleged in the complaint. Respectfully, there was a dispute among the courts as to whether investment managers had standing at that point in time. That dispute, at least within the Second Circuit, was resolved in Huff in a determination that investment managers do not have standing to bring claims. Although the Ninth Circuit has not specifically adopted Huff, every circuit court that has considered Huff has, in fact, adopted it. I'm aware of no circuit court that has not followed the reasoning of Huff. And so as it turns out, the uncertainty in the law on which they predicated their standing was clarified subsequently and determined that they, in fact, did not have standing. What troubles me is that, do you agree that a statute of limitations aside, that the only thing, the only consequence of this ruling that you're, this principle of law that you're relying on in this case, is that instead of filing an amended complaint, they file a new complaint? Certainly that is the practical consequence, but the legal... Does that make sense? Because of the importance of standing... The Supreme Court has said repeatedly that the importance of standing as an element of Article III... Nobody disputes that. The simple question is what the label is on a piece of paper, whether it says amended complaint or whether it says we start a new action. I mean, it just doesn't make any sense. And I'm not sure the Supreme Court case law is quite as clear. He mentioned the Newman case. There was another case in the Supreme Court that I had trouble finding, but I'm sure exists, where the Supreme Court allowed an amendment. In the Supreme Court, I think it was a union had to substitute a union and thereby create standing. I'm not aware of the case you're talking about. There is the Pressman Union case out of the Second Circuit, which actually came to the exact opposite result. It wouldn't allow an amendment to cure a standing defect that existed at the beginning of the case. And by the way, the holding of Newman Green is that Section 1653, which is often coupled with Rule 15d of the Federal Rules of Civil Procedure, cannot be used to cure defects in diversity jurisdiction that existed at the time of filing. The reason Newman Green comes out as it does is because Rule 21 permits a court at any time to drop dispensable non-diverse parties. And there was complete diversity absent the dispensable non-diverse party. Your argument on lack of standing is that when they filed their action August 28, 2008, they didn't own any shares. They never owned any shares. And on December 8, 2008, when they got an assignment of the rights of Mr. Holtz, that wasn't sufficient? That was not sufficient. Why was that not sufficient? Mr. Holtz owned shares as of August 8, didn't he? Mr. Holtz could have commenced this action and would have had standing. But once the action has been commenced, and this is also the court's holding, the Ninth Circuit's holding in Wilbur. Once an action has been commenced and there is a defect in standing, that defect in standing cannot be cured by subsequent events, whatever they may be. Whether it's an assignment from Mr. Holtz to Northstar, this is actually really indistinguishable from the many circuits. It all depends on how you use the word cure. It can be cured by filing a new complaint as opposed to something that has a label on it saying an amended complaint. It all strikes me as being crazy. I'm going to move on to the merits. I would submit that the case law is nevertheless clear that when there is a defect in standing that exists at the inception, it cannot be cured by subsequent events. What would the end effect be? I mean, if we would agree with you on that proposition, could they file a lawsuit the next day and we're destined to repeat history? If you agree with me on that proposition, and of course the Court is obligated to determine whether standing exists in the Federal Court before it goes any further, then I'm not sure what Northstar would do. Presumably they would file a new case. Or the they would or their S&R would or somebody would. This claim doesn't go away. It's very possible, but in that instance, you would have a case or controversy that is properly before the Federal Court, which is missing here. And that would generate a lot more legal fees. Well, we can all stipulate that being a good thing, I guess, for somebody. Moving to even if the Court determines that standing exists, there is abundant reason to affirm the District Court's decision dismissing each of Northstar's claims on the merits. The procedural history. Assuming you're right, what, did they have any remedy? Does Northstar have a remedy if I'm right on standing? No, no, no. Forget about it. Let's assume they have standing. We're getting to the merits now, I thought you said. Okay. And according to you, there's no contractual liability. There's no breach of fiduciary duty and whatever the third argument was. Can Schwab have done this, violated the terms of the mutual fund that had been adopted, and there's no remedy by the shareholders in the mutual fund? Well, Your Honor, of course I don't agree that Schwab violated the terms of the mutual fund. No, I understand that, but we're assuming that to be the case. The answer to your question is yes, and we've been quite plain about this throughout. And the Massachusetts Supreme Court in the Halabian case was quite plain about this just a few years ago. The remedy, the proper remedy for plaintiffs in the situation of Northstar would be to file a derivative suit for breach of fiduciary duty claiming that the trustees owed the duty to follow the fundamental investment objectives, that the advisor owed the duty to follow the fundamental investment objectives, and that it failed to do so. Who wins money as a result of all of this? I mean, the reality of this, whatever the legal formality is, is that this is an integrated single enterprise with Schwab forming various entities to effectuate it. But who gets money out of this derivative suit that you're talking about? Who gets relief? Well, shareholders will get relief. As with all derivative suits, if the trustees investigated the derivative demand and opted to pursue the claim and prevailed on the claim, then there would be a fund that would be distributed back to shareholders. Trustees would sue themselves? No. The trustees would make a determination. As with all derivative cases, what would happen would be an independent sub-board of the trustees with no affiliation with Schwab would in the first instance make a determination as to whether the derivative claim had merit. If they decided it did, they would hire counsel to sue whomever it was appropriate to sue, whether that was trustees with an affiliation with Schwab, whether it was the advisor. Whomever is part of the derivative demand and whomever the derivative investigation determines would be an appropriate defendant. And then the recovery of such a case, as with all derivative cases, would go to shareholders like the people that Northstar put into this. Current shareholders or would it go back to the shareholders that held at the time? I believe for certain current shareholders. And I'm not sure how far it stretches back. There is a rule. That may be the problem. Because current shareholders may be people that bought after the market bottomed out and suddenly they're in for a bonanza. I don't believe it's limited to current shareholders. I know there is a rule with respect to – it certainly includes current shareholders, is what I said. The question of whether it goes back to previous shareholders is sometimes confused with the question of who is a proper derivative plaintiff. There is a rule in derivative versus direct law that you cannot be a derivative plaintiff if you have not held your shares. You have to be a continuous shareholder. But I don't think that means that shareholders who were harmed as a result of the allegations in question would not participate in the plaintiff. But if I understand you, if current shareholders get compensated, then they're getting a windfall. That's what Judge Clifton said and I don't know that you disputed that. In other words, you're not giving the money to the people who were actually injured who may have purchased on the basis of the understanding of what their money would be invested in. Your Honor, I'm actually not sure that's the way it works. I do believe that the injured shareholders would participate as well. No, no. Participate is one thing. Whether they would get all that they were entitled to is another if they have to share it with current holders. Presumably injured parties are people that held during the time period when the fund was allegedly out of compliance. That stopped at some point in time. Anybody who acquired shares subsequent to that has no complaint. Shareholder actions aim more closely at that. I understand the legal theory is how this is a derivative action and I don't know either, but that could be an explanation for why a derivative action really isn't suitable for the claim that's tied to a certain time period and doesn't relate to current ownership. I have been through every one of the cases involving Massachusetts Business Trusts and mutual funds and whether those claims are derivative and direct. By the way, every single one of the cases that we cite holds for the proposition that those cases have to be brought derivatively. In your view, there's no difference between a Massachusetts Business Trust and a corporation? They're all the same? Yes. That argument on the part of North Star really does not hold water. In fact, the Massachusetts- Why does anybody form a Massachusetts Business Trust if it's just all the same as a corporation? Well, it's still a trust, but it has the- Well, what does that mean? It has the incidence of a corporation. You're saying it's the same thing as a corporation. I'm saying that for the purpose of determining whether the Massachusetts Corporate Act requiring that suits be brought derivatively applies, it is the same as a corporation and that's what the Massachusetts Supreme Judicial Court said just a few years ago in Holleybin. Maybe they avoid taxation. Who knows? They cite in their reply brief a fellow by the name of Round. Is that his name? And a treatise that seems to provide support for their proposition. Well, only if you read- You have to say that. What's your response? Yes, only if you read the selected portions that they choose to cite because  a particular trust is subject to fiduciary duties is governed in the first instance by state law and we know what Massachusetts says with respect to whether the trust can be sued directly or derivatively. Professor Rounds also says in the same law journal article that the rules of derivative versus direct apply to claims of fiduciary duty by trusts. So the issue is not whether there are fiduciary duties. The issue is whether those fiduciary claims can be brought directly and then start cease to bring or must be brought derivatively. So you agree that they allege a viable claim for breach of fiduciary duty. The only question is what kind of lawsuit they can bring, whether it's derivative or not. I agree that there is sufficient case precedent to suggest that under these circumstances a derivative breach of fiduciary duty claim can be brought. You answered my question. I just want to know. You agree that there was a breach of fiduciary duty if you accept the allegations of the complaint and the only question is the remedy. I agree that there could be under the facts alleged, accepted as true, a derivative claim for breach of fiduciary duty. So there is a breach of fiduciary duty.  Yes, Your Honor. Okay. Counsel cited to the Bergeron case in connection with breach of contract. In the Bergeron case, the question of whether a contract was formed was not a contested issue at all. On the other hand, both this Court's authority in McKesson and Cohen make abundantly clear that there is no viable breach of contract case in this instance. Putting aside the fact that North Star didn't own shares in 1997, didn't vote, their theory of contract doesn't have any of the classic elements of contract formation. Isn't, forget the standing issue again, isn't in effect the mutual fund saying, if you buy shares in the mutual fund, we agree to operate the mutual fund in this way? And why isn't that a contract? For the same reason it wasn't a contract in McKesson, for the same reason it wasn't a contract in Cohen. Forget about the cases. Just tell me as a matter of policy. Sure, because there is no offer, acceptance, or consideration. Under North Star's theory, let's play out the hypothetical. I don't know what you mean. You get a prospect. I'm hardly a sophisticated investor, but I do own mutual funds. You do get a prospectus. This prospectus tells you how this fund is going to operate. And I read the prospectus, as Schwab or whoever else is doing it, says, please read the prospectus. So I read it, and they say, this is how we propose to operate this fund, and this is what we're going to invest in. And we'll take what was in the proxy statement here. And I say, okay, I'm in. I'm going to buy the stock based on what you've just told me you're going to invest the money in. Why isn't that a kind of an offer and acceptance? I mean, there are implied contracts, too. You go into a taxicab. You don't enter into a contract formally with the taxi driver, but you basically implicitly agreed with the taxi driver that whatever is on the meter, you're going to pay him. And this strikes me as something that's quite similar. Well, Your Honor, respectfully, if a bilateral contract was formed, then did North Star breach the contract if its shareholders sold out? That would be the – if you really believe this is contract formation and there was a promise that we will have these investment objectives in exchange for your purchasing shares, then can we hold them to hold on to the shares? That – because any bilateral contract has to be breached by both sides. No, but that's because there are probably other parts of the agreement that gives them the right to sell. It doesn't mean that you're somehow relieved of the obligation because under another clause of this proxy, the holder of the shares in the mutual fund has a right to sell. Their contract theory would encompass acceptance by people who didn't vote, by people who voted and then changed their mind, by people who didn't own shares at the time. It is simply a non-workable contract theory. I'm forgetting about the vote. Once the vote is taken, your statement to someone who wants to buy stock says this is how we are going to invest the money that you give us. And I say, okay, I like this. I'm buying it. Why isn't that an agreement? Your Honor, I can only go back to this Court's decisions in McKesson and Cohen which under much more compelling circumstances found that there was no offer and acceptance based on the solicitation of a vote or subsequent purchasing of shares. It's not a solicitation of a vote. In fact, this particular shareholder comes along later, the one that made the assignment. He comes along after this and he reads what the he wants to buy Charles Schwab's mutual fund and he looks at the prospectus and he sees what they promised to do with the money and he says if this is what you're going to do with the money, I agree to invest it. And then they go ahead and breach the under the agreement and they don't invest it the way they promised it to him. Why isn't that a breach of contract? I mean, I don't think contracts are, you know, we think about a contract to someone as if you're just storing the last case. But there are all sorts of implied contracts which are enforced in the law. Your Honor, my answer is that because no court that I'm aware of constitutes an offer to contract. And they need an offer in order to perform a contract. But the prospectus tells you what you're buying. That tells you what you're buying. I don't quite, I'm trying to understand your argument. I have one more quick question and then I don't want to, of course. This argument about who can sue if this is a contract as opposed to breach of fiduciary duty, do we have a problem with it has to be a derivative suit or could it be an individual's? If they had formed a, if they could state a claim for breach of contract, then I'm not aware of anything that would require that claim be brought derivatively. If there are no further questions, I'll stop. Thank you. Mr. Finkel, come on back. You're welcome to come back. How much of the time you get to use for yourself, as opposed to our purposes, that remains to be seen. First, I just want to say that my adversary cited the Wilbur case in the Ninth Circuit, but the Wilbur case also said on page 116, and the site is 423F3rd at 1116, that Wilburs argued that if we hold that dismissal pursuant to Rule 19 is proper, we should allow them to amend their complaint to name a tribal official as a defendant. That issue is not before us because the Wilburs never sought to amend their complaint. Now, the inference there is that, is that, well, certainly the language says that the Court never said, the Ninth Circuit never said that you can't amend the complaint to alleged standing. There's one point that I want to address with regard to the derivative claim. Now, it's clear the derivative claim is on behalf of the fund. The money is going to go to the fund. The fund is going to keep the money. They're not going to give the money to North Star or Holtz or anybody else. The suit is on behalf of the fund if you find it's a derivative case. But it's not a derivative case. Scalia, I'm sort of indirectly because then the fund's net assets, I assume, would increase so that they would be able to. That's correct. But the fund used to have $1.5 billion. In part because it was mismanaged, it now has $900 million. Most of the people who held the fund in 2007 have sold down. The people who were injured, as Your Honor suggested, wouldn't benefit in a derivative case. That's clear. I mean, Mr. Swertz is saying that the fund will go and find Henry Holtz and give him money out of the goodness of its heart. That's not a derivative case. But you don't have to address the issue because the law is clear that it's a direct claim. Now, in this, the Ninth Circuit's decision in Lapidus, the Court says, quote, this is on 232F3 at 683, Now, here we satisfy both disjunctive elements of standing to bring a direct claim. The first one is it relates to the right to vote. Now, Schwab had a very specific policy here to track the index. They could have said we invest for profit, for example, and had a very general policy and then did something else. But the specific policy was to track an index only changeable by shareholder vote. By deviating from that fundamental investment objective, Schwab violated the shareholder's right to vote. So under the first string of Lapidus, it's clear, since it affects the shareholder's right to vote, it's a direct claim. Also, the injury that was suffered by the shareholders during the relevant period is distinct from that suffered by shareholders generally. Because even though the trend of performance of the fund was down, the trend was not the same on every day. Sometimes the fund would go down more than the index. Sometimes it would go down less than the index. To calculate damages, you don't look at the fund itself because damages didn't occur on any one day. But you look at when an investor purchased and when an investor sold, and you take the performance of the index against the performance of the fund over that period. So every individual investor in the fund is going to have a different quantum of damages. In Lapidus, it's only a derivative action if the losses suffered by the shareholders generally is uniform. In most cases, it is, because the fund is losing the money, and then the loss goes out to the individual investors through the diminution in the NAV. But here, the loss is suffered individually by the shareholders. Anyway, Your Honors, I appreciate your listening to me. I think it's a very strong case, and I look forward to prosecuting it. Thank you. Thank you. We thank both counsel for your arguments in this complicated case. That concludes the argument calendar. We are adjourned.
judges: Korman, Clifton, Bea